# JANUARY TERM, 1917.*

FIRST NATIONAL BANK OF ALLEGAN *v.* GRAND RAPIDS
& INDIANA RAILWAY CO.

1. APPEAL AND ERROR—FINDINGS OF FACT—REVIEW.

While this court will not reverse the trial court's findings
of fact, when supported by evidence, a finding entirely
unsupported by evidence will be considered erroneous in
law.

2. BILLS AND NOTES—BILL OF LADING—BANKS AND BANKING—
HOLDER IN DUE COURSE.

Where plaintiff bank received an indorsed bill of lading
with a sight draft attached, payable to its order, from a
produce dealer for a carload of potatoes sold to a firm in
New Orleans, the amount of said draft being placed to
the dealer's credit and checked oñt by him, and the bill
of lading and draft forwarded by plaintiff to a bank in
New Orleans for collection, plaintiff was a holder in due
course, for full consideration, and without notice of any
infirmity in the transaction.

3. CARRIERS—ORDER BILL OF LADING—DELIVERY OF GOODS—LIA-
BILITY.

In a suit for the value of a carload of potatoes, lost
through unauthorized delivery by the carrier, where the
bill of lading contained the following language: "The
surrender of this original bill of lading properly indorsed
shall be required before the delivery of the property," and
it is admitted that the carrier did deliver the property
without such surrender, and that it is liable unless plain-
tiff, through its agent consented to such delivery, evi-
dence examined, and *held*, insufficient to show that plain-
tiff authorized such delivery.

4. SAME—NEGLIGENCE—VENTILATION OF CAR.

The findings of the court below that the potatoes were
shipped in good condition in a refrigerator car, that in-
structions were given to the carrier to ventilate the car,
and that when they arrived at destination they were in a
damaged condition, caused by lack of proper ventilation,

*Continued from Vol. 194.

for which the carrier was liable, *held*, supported by the evidence.[1]

5. SAME—DAMAGES—MEASURE OF DAMAGES—MARKET VALUE.
   The court below, having found that defendant was liable for the value of the potatoes lost because of unauthorized delivery, and also for damages caused by improper ventilation of car, properly adopted as the measure of damages the market value of the potatoes at the time they arrived at destination if they had arrived in good condition; and, *held*, evidence sufficient to show market value at destination.

Error to Allegan; Cross, J.  Submitted October 24, 1916.  (Docket No. 65.)  Decided March 29, 1917.

Assumpsit by the First National Bank of Allegan against the Grand Rapids & Indiana Railway Company for the wrongful delivery of freight consigned with draft attached to bill of lading, heard before the court without a jury.  Judgment for plaintiff.  Defendant brings error.  Affirmed.

*James H. Campbell* (*Elvert M. Davis*, of counsel), for appellant.

*Charles Thew*, for appellee.

STONE, J.  This is an action in assumpsit, brought by the plaintiff against the defendant as an initial carrier.  The subject of the suit is a carload of potatoes, of which plaintiff claims to have been the owner, shipped from Tustin, Mich., to New Orleans, La., about April 12, 1912.  The potatoes were loaded at Tustin by E. F. Sherman, the then owner thereof, who lived at that time at Allegan, Mich.  They were loaded during a period of a few days previous to April 12, 1912.  The potatoes had been grown by farmers in the vicinity of Tustin, from whom they were a short time before purchased by Mr. Sherman, and by him placed in a storage cellar that he had rented.  The

---

[1]On the liability of carrier for injury by failure to adjust ventilators, see note in 15 L. R. A. (N. S.) 801.

temperature of the cellar in which the potatoes had been kept after their purchase and before loading in the car for shipment to New Orleans was kept at 35 to 40 degrees above zero. At the time of loading, the potatoes were sacked in the cellar and hauled two blocks for shipment.

The car in which the potatoes that are the subject of this suit were loaded was a refrigerator car, identified throughout the case as car I. C. 55928, and to prepare it for shipment, one of Mr. Sherman's employees, who had charge of the loading, put a stove in the car and heated it for 12 hours, that being the period of time usually taken to heat cars being loaded with potatoes in cold weather. After heating the car for this period the potatoes were loaded into it. The weather was moderate when the potatoes were loaded. It was not freezing, but was cold weather. The ventilators on this car were on top. They were closed when loading and when delivered to the railroad. Two other cars were loaded for shipment to New Orleans about the same time. The car in question left Tustin some time on April 12, 1912, and arrived at New Orleans during the day of April 20, 1912, and was placed at the perishable freight sheds of the Louisville & Nashville Railroad Company. The other two cars, after arrival, were placed in the freight sheds of the Illinois Central Railroad Company. The bill of lading issued to Mr. Sherman, the shipper of the potatoes, by the defendant as initial carrier, was a "uniform order bill of lading," and the potatoes were consigned—

"to order of E. F. Sherman, destination New Orleans, State of Louisiana, notify Hortman Brokerage Co. at New Orleans, State of Louisiana. Route Van & I. C."

The directions upon the bill of lading were:

"Allow inspection. Keep car ventilated.
                    "E. F. Sherman, Shipper."

On the 13th day of April, 1912, the day after the departure of the potatoes from Tustin, Mr. Sherman, who had for a number of years been doing business with the plaintiff bank, indorsed the bill of lading in blank and delivered it to the plaintiff with a draft attached, payable to its order, in the amount of $817.50, drawn on the Hortman Brokerage Company, New Orleans, La. The plaintiff, on the same day, mailed the draft, duly indorsed, with the bill of lading attached, to the Canal Louisiana Bank & Trust Company, at New Orleans, for collection.

There are two counts in the declaration. The first alleges that the defendant, as initial carrier, is responsible under the laws of this State and the United States for the wrongful act of its connecting carriers, and that the Louisville & Nashville Railway Company, the terminal carrier, carelessly, negligently, and improperly delivered the potatoes to strangers, who were not entitled thereto, without surrender to it of the original bill of lading properly indorsed, whereby the plaintiff wholly lost the said goods, etc. The second count alleges that the defendant is liable for failure to keep the car in which the potatoes were being carried properly ventilated, etc.

The case was tried before the court without a jury, and after hearing the testimony and the arguments of counsel it filed written findings of facts and law, in which the defendant was found liable under both counts of the declaration. The findings of law and fact were as follows:

"Plaintiff brought this suit against the defendant, a common carrier, to recover damages for negligence in not taking proper care of freight and for the wrongful delivery thereof.

"Issue was joined and a trial had before the court without a jury.

"April 12, 1912, Mr. E. F. Sherman loaded a car of potatoes at Tustin, Mich., and received from the

defendant an order form bill of lading, consigning the goods to himself at New Orleans, La., with the direction to notify Hortman Brokerage Company of the arrival of the consignment.

"Mr. Sherman drew a draft upon Hortman Brokerage Company, of New Orleans, for the purchase price of the potatoes, attached the same to the bill of lading and sold the draft, with the bill of lading attached, to the plaintiff. Plaintiff paid for the same by crediting Mr. Sherman's account at the bank with the amount thereof, viz., $817.50.

"The consignment was loaded in a refrigerator car and was sent over defendant's lines and connecting lines to New Orleans. At the time the car was loaded the weather was cold at Tustin, Mich., and the ventilators were closed and the car properly warmed to protect the potatoes from the cold weather. Instructions were given the defendant to properly ventilate the car as it moved south, where it would encounter warmer weather.

"When the car arrived at New Orleans some of the sacks were soiled and some of the potatoes spoiled. The consignment was refused, and Mr. Sherman sent his agent, Mr. Tanner, to New Orleans, with oral and written instructions to settle the matter as quickly as possible by making Hortman Brokerage Company take care of the drafts and by giving a check on Mr. Sherman for the loss by reason of the spoiled potatoes. The potatoes were sorted and the good ones sold by Hortman Brokerage Company to J. L. Beer & Co., and delivery was made by the Louisville & Nashville Railway Company without requiring the surrender of the bill of lading, and without the draft being paid.

"Plaintiff accepted and paid for said bill of lading on April 13, 1912, without notice of any equity or claim against some of the goods it covered, and is a *bona fide* holder for value, and has not received said sum from the defendant, or any one.

"Plaintiff did not authorize any one to consent to the delivery of the potatoes to any one without first paying said draft and taking up said bill of lading, and the Louisville & Nashville Railway Company had no authority from plaintiff to deliver to J. L. Beer & Co. said consignment. On the contrary, the Louisville & Nashville Railway Company were informed by

Mr. Tanner before said delivery, that the bill of lading with the draft attached had been indorsed to plaintiff and was in the Canal Bank & Trust Company in New Orleans for collection, and that he had no authority or control over the same. A wrongful delivery having been made, defendant is liable for the market value of the consignment.

"When the potatoes were loaded at Tustin they were in good condition and were properly loaded. The evidence clearly shows that the condition in which they arrived at New Orleans was caused by the car not being properly ventilated while in transit.

"The defendant is therefore liable to the plaintiff for failing to properly ventilate the car while in transit, for the difference between their actual value on arrival in New Orleans, and the value of the same had the car been properly ventilated and the potatoes arrived in good condition.

"The market value of the potatoes at the time they arrived in New Orleans, if they arrived in good condition, would have been $1.53 per bushel, less the freight, making a total net value of $817.50.

"Plaintiff is entitled to recover under both counts in the declaration its damages in the sum of $817.50, with interest at 5 per cent. from April 20, 1912, to date, or $1,051.57.

"It is therefore ordered that judgment be entered in favor of the plaintiff and against the defendant for the sum of $1,051.57, with costs to be taxed."

Upon these findings judgment was entered against the defendant for $1,051.57 damages, with costs. The defendant, under the rule, prepared the following amendments to the findings:

(1) "The court finds that there was a general oral understanding and agreement between the plaintiff and E. F. Sherman, the shipper of the potatoes and the consignee named in the bill of lading, before and at the time of the indorsement of the bill of lading to the plaintiff by said Sherman, that if the draft attached to the bill of lading was not paid the shipper and the consignee named, Sherman, would eventually pay to the plaintiff the amount of the draft."

(2) "The court finds that there was an agreement

between the plaintiff and the shipper of the potatoes, E. F. Sherman, who was the consignee named in the bill of lading, after the delivery of the potatoes covered by said bill at New Orleans without surrender of the bill of lading and before the commencement of this action, and during the pendency of this action, that the plaintiff would sue the defendant carrier for the purpose of recovering in this action for the benefit of both Sherman and the plaintiff, and if its action should fail the said Sherman would pay to the plaintiff the amount of the draft."

(3) "The court finds that Mr. Tanner was sent by Sherman, the shipper of the potatoes, to New Orleans to dispose of the consignment as speedily as possible, and had authority to dispose of them at once on account of the very warm weather prevailing at New Orleans, and was given authority to settle the matter as quickly as possible, and was authorized, if he could settle in no other way, to give a check for the difference on the car after sorting the potatoes and eliminating the shrinkage, and take up the drafts."

(4) "On or about April 23, 1912, and shortly after the departure of Tanner for New Orleans under instructions from Sherman, and before the potatoes were disposed of and delivered by the terminal carrier, the plaintiff knew of the refusal of the potatoes at New Orleans and the reason given therefor, and through its officer, Mr. Chichester, took the matter up with Mr. Sherman, and from him received full information concerning the sending of Tanner to New Orleans by Sherman, and knew that Tanner had gone there to dispose of the potatoes and settle the matter, and saw a copy of the letter written by Sherman to Tanner April 20, 1912, after his departure, and fully approved of Mr. Sherman's action in this connection in sending Tanner for the purpose of disposing of the potatoes."

(5) "That after such information received by the plaintiff from Sherman the plaintiff took no steps to revoke any authority given Tanner by Sherman or to repudiate his agency. On the contrary, plaintiff fully approved of his errand and authority."

(6) "That Mr. Tanner was the agent of said Sherman, and sent by him to New Orleans on or about April 20, 1912, for the purpose of disposing of the potatoes then in the custody of the carriers at that

place ana awaiting disposal by said Sherman because of refusal by the Hortman Brokerage Company, who was notified of their arrival at that point."

(7) "That at the time the consignment left Tustin, and upon arrival of the same at New Orleans, the consignment had not been sold by Sherman to either the Hortman Brokerage Company or any other person, and there was no completed contract for sale then existing, nor existing at the time Tanner was sent by Sherman to New Orleans."

(8) "That Sherman was authorized by the plaintiff to represent any interest that the plaintiff had in the potatoes and to control any disposition of them during transit or after arrival at destination, and the plaintiff fully approved and ratified Sherman's act in sending Tanner to New Orleans, and the authority given him for disposal of the potatoes, and any settlement of the transaction that he might make, because of the immediate necessitv of the disposal of the potatoes."

(9) "Shortly after his arrival at New Orleans, Mr. Tanner, the agent of both Sherman and the plaintiff, informed the Hortman Brokerage Company of his authority and the purpose of his presence there, and suggested to the Hortman Brokerage Company that it negotiate with Beer & Co. to take the good potatoes that should be left after the consignment was sorted. The Hortman Company submitted the negotiations proposed by Tanner to Beer & Co., and the proposition was accepted by Beer & Co. Thereafter, with his approval and knowledge, the potatoes were delivered to Beer & Co. after sorting."

(10) "Mr. Tanner, the agent, was present and ratified the act of the Hortman Company in making sale of the potatoes to Beer & Co."

(11) "Mr. Tanner and the Hortman Brokerage Company, his brokers, sold the potatoes to Beer & Co. at the prevailing market price at New Orleans, which was $1.20 per bushel."

(12) "After sorting, the potatoes yielded 27,130 pounds of good potatoes. The gross amount, at $1.20 per bushel, was $542.60. From this amount there was to be deducted freight of $150 upon the consignment from Tustin to New Orleans and the expense of sorting, $15.50, and weighing, $4.87, a total deduction of

$170.37, all of which was known and understood and approved by Tanner."

(13) "After delivery of the potatoes Tanner made no settlement, and did not attempt to make any settlement, with Hortman Company before he left New Orleans, and did not give or offer to give to the Hortman Company a check to cover the shrinkage, and did not ask or insist upon the Hortman Company taking up the draft."

(14) "Before departure from New Orleans, and after delivery of the potatoes, Tanner promised the Hortman Company that he would have Sherman send the bills of lading to the Hortman Company upon his arrival at Allegan."

(15) "While in New Orleans Tanner took charge of the sorting and weighing of the potatoes, made complaints to the representative of the Hortman Company, his broker, as to the manner of sorting, objected to the help employed, and upon his complaint and with his approval some of the sorting help were discharged by his broker, and Tanner gave away and permitted to be taken away from the sorting shed some of the good potatoes, and while in and about the sorting shed represented himself as the agent of Sherman, and assumed to have and asserted general authority over the disposition of the potatoes."

(16) "Tanner never informed any person connected with or representing the Louisville & Nashville Railroad Company, the terminal carrier, that the potatoes should not be delivered to Beer & Co. without payment of the drafts and surrender of the bill of lading. On the contrary, he represented himself to be the agent of the owner, and was the agent of the owner, whether the owner was Sherman or the plaintiff, and delivery was made to Beer & Co. upon his suggestion and with his approval."

(17) "There is no evidence in the case that the car containing the potatoes was not ventilated during transit, or that the car was not properly handled by the carriers in accordance with the shipper's instructions."

(18) "The evidence shows that the potatoes were a perishable commodity, and after arrival at New Orleans and at the time of the refusal, and before disposal by Tanner, were in such condition that it

was necessary to make immediate disposal of them, and that if they had not been speedily sold by Tanner through the medium of the Hortman Brokerage Company, his broker, it would have been necessary for the terminal carrier to sell them as perishable property, and because of the excessively warm weather, and the condition of the potatoes, and their perishable character, and their refusal at destination, they were sold by and upon the order of the shipper."

"Proposed Amendments to Findings of Law.

(1) "This court finds as a matter of law that Tanner was the agent of the plaintiff while at New Orleans, and while engaged in his errand there, and during the sorting and disposal of the potatoes contained in the car in question."

(2) "That the car of potatoes in question were delivered by the Louisville & Nashville, the terminal carrier, upon the order of the shipper and consignee named and the owner of the potatoes and his and its agent."

(3) "That by reason of the failure of the plaintiff to repudiate or revoke the authority granted to Tanner by Sherman, the plaintiff is estopped to deny any authority in Tanner to dispose of the potatoes and to claim that delivery was made to the wrong person."

(4) "That as a matter of law the potatoes were delivered to the agent of the owner thereof, and no surrender of the bill of lading was necessary, and the delivery of such potatoes to the owner's agent was a proper and lawful delivery."

(5) "The court finds as a matter of law that the disposal of the potatoes at New Orleans in the manner disposed of was a necessity, because of their condition and perishable character, and that, to protect the interests of all persons concerned, the delivery was a lawful and proper delivery."

Of the proposed amendments, No. 1 to the finding of facts was allowed, and all of the others were refused. Exceptions to such refusal were duly filed; also exceptions to the following findings of facts made by the court (and it is alleged that there is manifest

error in the same and that the same do not support the judgment) :

"(1) That Mr. Sherman sold the draft with the bill of lading attached to the plaintiff.

"(2) That Mr. Sherman gave to his agent, Tanner, oral and written instructions to settle the matter as quickly as possible, by making the Hortman Brokerage Company take care of the drafts, and by giving a check on Mr. Sherman for the loss by reason of the spoiled potatoes.

"(3) That the potatoes were sold by the Hortman Brokerage Company to J. L. Beer. & Co.

"(4) That the plaintiff accepted and paid for the bill of lading on April 13, 1912, without notice of any equity or claim against the same or the goods it covered.

"(5) That the plaintiff did not authorize any one to consent to the delivery of the potatoes to any one without first paying said draft and taking up said bill of lading.

"(6) That the Louisville & Nashville Railway Company were informed by Mr. Tanner before delivery that the bill of lading with the draft attached had been indorsed to plaintiff and was in the Canal Bank & Trust Company, New Orleans, for collection, and that he had no authority or control over the same.

"(7) That the condition in which the potatoes were when they arrived at New Orleans was caused by the car not being properly ventilated while in transit.

"(8) That the market value of the potatoes at the time of arrival in New Orleans, if same had arrived in good condition, would have been $1.53, less the freight, making a total net value of $817.50."

"(d) And the defendant excepts to the following findings of law made by the court and alleges manifest error in the same:

"(1) That as a matter of law Mr. Sherman sold the draft with the bill of lading attached to the plaintiff.

"(2) That the plaintiff is a *bona fide* holder for value of the draft.

"(3) That as a matter of law the plaintiff did not authorize any one to consent to the delivery of the

potatoes to any one without first paying said draft and taking up said bill of lading.

"(4) That the Louisville & Nashville Railway Company had no authority from plaintiff to deliver to J. L. Beer & Co. said consignment.

"(5) That a wrongful delivery was made by the carriers, and that the defendant is liable for the market value of the consignment.

"(6) That as a matter of law the defendant is liable to the plaintiff, for failing to properly ventilate the car while in transit, for the difference between the actual value of the potatoes on arrival at New Orleans and the value of the same had the car been properly ventilated and the potatoes arrived in good condition.

"(7) That the plaintiff is entitled to recover on both counts in the declaration its damages in the sum of $817.50, with interest at 5 per cent. from April 20, 1912.

"(8) That judgment be entered in favor of the plaintiff against the defendant in the sum of $1,051.57, with costs to be taxed."

"(e) And the defendant excepts to the finding of facts as made by the court, and alleges that there is manifest error in the same and that the same does not support the judgment entered in said cause."

At the close of plaintiff's testimony the defendant moved the court to enter a judgment for the defendant on both counts of the declaration. This motion was overruled by the trial judge, and exception duly taken.

The defendant has brought the case here for review, and there are 48 assignments of error. To take up and discuss each of these assignments of error, as counsel for appellant have done, in their briefs of over 100 pages, would necessitate an opinion of unreasonable length. The record and briefs have received our careful attention, and the assignments of error are principally based upon the exceptions to the refusal to allow the proposed amendments to the findings, and upon the exceptions to the findings of the court. Counsel for defendant, in their main brief, state the rule which they invoke as follows:

"While we do not expect this court to reverse the trial court's findings of fact, when any of the findings are supported by evidence, we believe a finding entirely unsupported by evidence will be considered erroneous in law."

Agreeing with counsel in the correctness of this rule, we will proceed to examine the questions involved. We also agree with counsel that the duty and rights of the carrier are well set forth in the recent cases of *Nelson Grain Co.* v. *Railroad Co.*, 174 Mich. 80 (140 N. W. 486); *Turnbull* v. *Railroad Co.*, 183 Mich. 213 (150 N. W. 132); *Thomas* v. *Blair*, 185 Mich. 422 (151 N. W. 1041).

Counsel for appellant first discuss the question whether the plaintiff was a *bona fide* owner of the bill of lading, taking the position that it was not a *bona fide* owner either of the bill of lading, or of the potatoes covered by it; and it is urged that the plaintiff was no more than a pledgee of the bill of lading, which it held for collection.

Counsel concede that the burden of proof, to show that the plaintiff was not a *bona fide* holder, was upon the defendant in this case. An examination of the testimony, especially that of Mr. Chichester, as a whole, satisfies us that the intention of the parties was that the plaintiff was to become the owner of the bill of lading. The day following the loading of the car, the draft with the bill of lading attached and indorsed by Mr. Sherman was received by the bank in its usual course of business, and was at once forwarded to the New Orleans bank for collection. Sherman was in the business of buying and shipping produce, and he used this draft, and other like drafts, to get money to carry on his business, and in this case the proceeds were placed to his credit in his commercial account, and he checked out this money and used it. We think that it must be held that under the evidence

the plaintiff took this bill of lading and draft, not only for a full, adequate consideration, paid at the time, but without any notice of any infirmity in the transaction. In fact, there was no infirmity at that time in the title or condition of the property transferred. There was evidence to sustain the findings of the court in this regard. In *Turnbull* v. *Railroad Co.*, *supra*, we said:

"It is true that *prima facie* the consignee is the owner of the goods shipped, but it is equally true, and the rule is well established, that, when there is an order bill of lading outstanding, the carrier delivering the goods without requiring the presentation of the bill does so at his peril, and is liable to a *bona fide* holder thereof."

The bill of lading contained this language:

"The surrender of this original bill of lading properly indorsed shall be required before the delivery of the property."

That the railroad company, the terminal carrier, did deliver the property without such a surrender, is admitted. But defendant claims that the plaintiff, by Tanner, released to the railroad company its right to insist upon this provision, by consenting that the railroad company might deliver the potatoes to a third party without the surrender of the bill of lading. To sustain this defense it should appear that Tanner was plaintiff's agent with such authority, and that he did so. The court below found that:

"Plaintiff did not authorize any one to consent to the delivery of the potatoes to any one without first paying said draft and taking up said bill of lading, and the Louisville & Nashville Railway Company had no authority from the plaintiff to deliver to J. L. Beer & Co. said consignment."

This was a finding of fact necessary to sustaining

the judgment.  Attention is called to that part of the finding relating to the sending of Tanner by Sherman with instructions, oral and written, to settle the matter as quickly as possible by making the Hortman Brokerage Company take care of the draft and to give Sherman's check for the loss by reason of the spoiled' potatoes.  There was evidence which may be said to be uncontradicted that Tanner's oral authority was the same as his written authority.  Such written authority was contained in Sherman's letter to Tanner of April 20, 1912, and was as follows:

"ALLEGAN, MICH., April 20, 1912.
"F. E. TANNER,
  "New Orleans, La.
"*Dear Sir:*
  "Herewith I hand you invoice for the potatoes sold to Beers & Stick.  Please note prices they were sold at and you must insist their taking the potatoes at the prices sold.  Of course there has been a big drop in the potato market, but I cannot release them under the purchase price.  If potatoes show decay, you will have to discount the amount of shrinkage.  I have been told that potatoes arriving over the Illinois Central are unloaded in the Illinois Central sheds, and held there until receivers take them.  If this is true, and you do not have a chance to see cars they arrived in, inspect the 400 sacks car thoroughly and see if they were frozen in transit.  If so, have notation made on freight bill, and the other cars the same.  The refrigerators are to be kept ventilated.  Have notification made of this.  Call on the Hortman Brokerage Company first and learn from them why Beers & Stick refused the car; then insist that the Hortman Brokerage Company and Beers & Stick go over the cars with you and inspect them thoroughly together.  You will see by the copy of their wires that they refused the cars on account of all sacks being more or less stained and spotted.  Inspect them thoroughly before you make any suggestion.  I suppose it is very warm there and stock must be disposed of at once.  Settle this matter as quick as possible.  Make them take care of the drafts and you can give them a check for the

difference on each car, if that is the only way you can settle with them.

"Very respectfully,
"E. F. SHERMAN."

We think that the findings above referred to were supported by the evidence. The question is, not what authority Tanner had in respect to sorting, determining the shrinkage of potatoes, and checking against the loss, or to see that the purchasers or others took them, but whether he had authority to authorize the railway company to deliver them, without taking up the bill of lading. The instructions were:

"Make them take care of the drafts, and you can give them a check for the difference on each car, if that is the only way you can settle with them."

The interests of the plaintiff and Sherman at that time were these: The plaintiff had its money in this draft secured only by the bill of lading, both in the New Orleans bank, to be given up on payment of the draft. If it could not realize it could look to Sherman. Sherman was interested in the potatoes, by reason of his ultimate liability, and it was "up to him" to have the purchasers, who, he claimed, had ordered these potatoes, take them, and thereby not lose the sale, and not to lose, by reason of shrinkage, any more than possible. The plaintiff was not interested in the method he might use, so long as he brought about the taking up of this draft, and it stood, relying upon its right, that the potatoes could not be delivered by the railway company until this draft was paid. We think that the court was, under the evidence, justified in finding that no one was given authority to allow the railroad company, or any one else, to handle or take over the potatoes contrary to the terms of the bill of lading.

There was evidence to support the finding as to what Tanner actually did with reference to the pota-

toes.  The railroad company was informed by Tanner, before the delivery, that the bill of lading, with the draft attached, had been indorsed to the plaintiff, and was in the bank at New Orleans for collection, and that he had no authority or control over them.  Without pursuing this matter further, we are of opinion that the trial court was warranted by the evidence in concluding that there was a wrongful delivery of the goods, and that defendant was liable for the market value of the consignment, as found.  There was much contradictory evidence, but with that, upon this record, we are not at liberty to deal.

Upon the second branch of the case the court found that the potatoes were loaded in a refrigerator car, sent over defendant's line, and connecting line to New Orleans; that when loaded the weather was cold at Tustin; that the ventilators were closed and the car properly heated to protect the potatoes from cold weather; that instructions were given defendant to properly ventilate the car, as it moved south where it would naturally encounter warmer weather; that when loaded at Tustin they were in good condition and properly loaded; and that when they arrived in New Orleans the sacks were stained, and some of the potatoes spoiled.  There was evidence tending to show that the condition in which the potatoes were when they arrived in New Orleans was caused by the car not being properly ventilated while in transit.

We find no error in the measure of damages adopted by the trial court.  There was some evidence of the market value at New Orleans supporting the finding.

We think that the findings of the court were sufficient to support the judgment below, and the same is affirmed.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.  PERSON, J., did not sit.